JEFFREY L. CLEMENS
412 Dockway Drive
Huron, OH 44839
(419) 433-4438

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JEFFREY L. CLEMENS, | ) | No. 07-10845-RGS |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF OPPOSITION TO** |
| | ) | **DEFENDANT TOWN OF SCITUATE'S** |
| v. | ) | **(AND OTHER'S) MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| TOWN OF SCITUATE, SHELLY | ) | |
| LAVERONI, JERRY LAVERONI, | ) | |
| MICHAEL O'HARA, JOHN ROONEY, | ) | Hon. Robert G. Stearns |
| and others, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The plaintiff, Jeffrey L. Clemens, does hereby oppose Defendant Town of Scituate's (and other's) motion for summary judgment as follows:

A) Plaintiff's September 2008 jury verdict is currently *in appeal* and likely to be vacated given egregious errors on part of the trial court – errors that served, among other things, to keep Shelly Laveroni and others from testifying and thus undermine plaintiff's ability to attack the credibility of Defendant O'Hara; further discovery is required to reconcile discrepancies in the current record that otherwise strongly suggest a police cover-up;

B) Plaintiff's December 10, 2008 continuance without a finding plea was *withdrawn* or otherwise attempted to be withdrawn on the basis, among others, that the underlying complaint was defective on the face; facts to which were pled – plain and simple – are not sufficient to support a charge of unlicensed private investigator; the plaintiff, on December 17, 2008, prepared and sent to be filed [but the court did not file it] a plea withdraw request but which has *not yet been addressed* by the presiding court;

C) Defendant's are benefitting from their own misconduct; the plaintiff's September trial, conviction and subsequent incarceration was a direct result of police misconduct, perjury and a trial wherein the plaintiff was actually forced by the court to conduct the trial

       himself even though he was entirely unprepared; original charges were false and a trial merely an iteration of the false allegations upon which such charges were brought;

D)      The defendants are not in compliance with Local Rule 7.1(A)(2); the extremely late appearance of Defendants Shelly Laveroni and Jerry Laveroni is a tactical maneuver to avoid having to testify under oath either in a deposition or a trial; given their timing, appearance in these proceedings at this point provides them undue benefit from their co-defendants' misconduct; the record is entirely void of any signed or stated testimony from Shelly Laveroni regarding the police allegation that the plaintiff held himself out as a private investigator and, at that, in such way as to require a license; in any case, separation of the charges against plaintiff prior to trial by persons unknown and, in turn, going to trial on the disorderly conduct charge without trying the unlicensed private detective charge together with it, proved highly prejudicial to the plaintiff's defense;

E)      Further discovery will help to more clearly define the plaintiff's 42 U.S.C. § 1983 claim against the Town of Scituate, among others; radio logs obtained only as of last summer – 14 months *after* filing of the instant complaint and *38 months* after plaintiff's arrest – reveal highly disturbing practices and willful lack of professional training among its 9-1-1 radio dispatchers, actions that, in the instant case, provoked a false arrest of the plaintiff;

F)      Further discovery will help to more clearly define the extent to which certain defendants have purposely skewered, avoided or otherwise omitted testimony of Susan Smith and Sandra Frankman [Laveroni neighbors] from the official record in order to bring a charge of harassment itself wholly unfounded and an otherwise tortious act toward discrediting plaintiff and "backfilling" or otherwise "boosting" the other charges brought against him.

## I. INTRODUCTION

The defendants, in bringing their summary judgment motion at this time, are taking full advantage of the fact that the plaintiff was [until recently] incarcerated and, at that, incarcerated due to their own acts and omissions notwithstanding any so-called jury verdict or plea. Thus far, there has been no legitimate disposition of the criminal charges brought against the plaintiff by the defendants. As the following argument and analysis will show, further discovery is not only permitted per Rule 56 but is, in fact, imperative given the extremely high level and subtle nature of deception used by the defendants in reporting and later testifying against the plaintiff at a trial that was nothing more than an ambush. Not only will further discovery prove the instant claims but as well serve to collaterally attack a most unjust verdict and plea proceeding.

## II. ARGUMENT AND ANALYSIS

### A. Plaintiff's September 2008 jury verdict is not valid and therefore does not support summary judgment; further discovery is required.

When it comes right down to it – fancy writing and legal argument aside – the current motion by the defendants is based upon one erroneous assumption: the September 2008 jury verdict and December 2008 plea were valid. They are *not* valid. They are but a further product of police misconduct aided by the trial court and a presiding judge whose conduct was highly questionable. A short listing of the plaintiff's appellate brief Arguments and Questions Presented quickly demonstrate just how god-awfully unfair the September 18, 2008 trial [upon which this motion is based in greater part] truly was. *See* Exhibit A - Appeal Brief, Pages 1,2,4

For example, right off the bat [on the day of trial], appointed counsel indicated plaintiff was "ready". However, the plaintiff immediately approached the microphone, asked to speak [twice], and was systematically ignored. [Exhibit T - P.3 Lines 12,14] Later, when counsel finally told the court that the plaintiff indicated that the defense was not prepared to go forward [with a trial] that, too, was essentially ignored as were several in-trial motions for mistrial. [Exhibit T - P. 18, Line 17-20]. In fact, at a later mistrial hearing [October 2008] based on a written motion, plaintiff was clear [Exhibit TT] as for citing how unprepared he was for the September trial given that: a) counsel called no witnesses and had no audio transcriptions [though he previously sought them; *See* Exhibit H - Motion For Expenses] or any other documents while: b) plaintiff held the belief it was to have been a pretrial motion status hearing and himself had made no preparation.

But most egregious of all, the plaintiff [a non-practitioner having no trial experience whatsoever] had essentially been ordered by the court to conduct his own trial upon withdrawal of [then] defense counsel and in lieu of any opportunity whatsoever for the plaintiff to obtain

3

other counsel or, at that, to try the case on another day. *See* Exhibit T - Page 28 And who was missing from this very trial? Defendants *Shelly Laveroni* and *Timothy Goyette*. Present, though, was Defendant O'Hara who then proceeded to tell the jury anything he so well pleased. In fact, he did just that, repeatedly told the jury, in near complete contradiction of the facts laid out by the plaintiff both in his complaint and at his trial, and echoing the police report almost to a "T", that upon supposedly telling the plaintiff he was going to "research" a so-called private investigator claim and that the plaintiff was "free to go", the plaintiff became "enraged" and "lunged" at him screaming "I want to settle this fucking now". *See* Exhibit T - Page 47, Lines 10-23 , Exhibit E - Police Report In both instances, at trial and in his report, O'Hara precedes his allegations of so-called disorderly conduct with reference to a private investigator claim, that is, to a statement by Shelly Laveroni that the plaintiff had claimed to be a private investigator." Really? Do we *know* this? After all, where was Shelly Laveroni? [Not at the trial!] And what about Defendant Goyette, who surely must have witnessed O'Hara saying that whole private investigator jazz to the plaintiff, where was he? [Not at the trial!] And so, what are we to make of this private investigator claim? If such claim is successfully impeached [through deposition of Shelly Laveroni] could we not then successfully challenge both the September 2008 jury verdict and the December 2008 plea notwithstanding a reversal on appeal or withdrawal proceeding? After all, plaintiff was charged and convicted *solely* upon the testimony of Defendant O'Hara and his testimony alone.

**B.     Plaintiff's December 2008 plea is not valid; the plea has been withdrawn for want of sufficiency of evidence and therefore does not support summary judgment.**

When it comes right down to it, the plaintiff was flimflammed by the Hingham District Court with regard to the unlicensed private detective charge. On September 16, 2008, defense counsel, late as it was, filed a motion to dismiss. *See* Exhibit C The plaintiff supplemented such

4

motion with a briefing of his own on November xx, 2008 [interpreted by the court as a separate motion] further arguing for a show cause hearing. *See* Exhibit D  Meanwhile, at an October 31, 2008 status hearing, upon request of the plaintiff, a trial date was scheduled for November 25, 2008. However, the court [Judge Barrett], on or about November 19, 2008, denied the [two] motions to dismiss without granting the plaintiff any opportunity to have a show cause hearing to which he was unmistakenly entitled. Barrett erred egregiously by choosing to entirely ignore the obvious: the plaintiff was *not* arrested for unlicensed private detective [he was arrested for disorderly conduct]. State statues are such that a defendant in a criminal case, when a charge is brought through a complaint and not an arrest, upon a request "seasonally made", is entitled to a show cause hearing wherein, in the case of the plaintiff, and upon the summoning of relevant witnesses, the long awaited question [first posed by the plaintiff when standing roadside with Defendant O'Hara back in May 2005 but which was met with "I don't have to tell you"] could finally be addressed: Just what exactly *did* Shelly Laveroni say to Officers O'Hara and Goyette with respect to: a) a private investigator claim, and b) what her neighbors Frankman and Smith supposedly said to her? These are the very questions that the plaintiff put to Officer O'Hara, in kind fashion, shortly before O'Hara arrested him for supposedly getting angry, "enraged", and "lunging at him". *See* Exhibit T - Pages 101-102; Exhibit G - Excerpt from Plaintiff Declaration Dated August 2005, Complaint – Page 6, Paragraph 15

To this very day – 45 months after-the-fact – these essential questions have not been officially answered. Surely, the plaintiff is entitled to have then answered in so-called discovery and certainly before motions are introduced by the defendants asserting that "there are no genuine issues of material fact". There is indeed issues of material fact that must see the light of day either by discovery or trial. F.R.C.P. Rule 56(f) states, in relevant part:

5

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

Furthermore, Rule 56(e) states: The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits." Nearly this entire case hinges upon whether or not Shelly ever told the police that the plaintiff told her he was a private investigator. The plaintiff, on the day in question [May 12, 2005], never made such a claim [*See* Complaint, Page 6, Paragraph 15] nor did Shelly, in her 9-1-1 call, with clear opportunity to say so, ever made such a claim or reference either. Yet Defendant O'Hara and the Commonwealth's entire criminal case against the plaintiff is tied to this single allegation. Only a deposition [or trial], where Shelly Laveroni is under oath and under examination, can resolve this critical issue of material fact once and for all. However, no one it seems, apart from the plaintiff, and especially the prosecution, wants to resolve this fundamental issue, particularly in a trial situation. And why is this?

A trial on the unlicensed private detective charge would have, by necessity, resolved this primary issue since the prosecution would have to prove the requisite elements of the relevant state statute [Massachusetts General Laws, Chapter 147, Section 23] which, for unlicensed private detective reads, in relevant part:

> No person shall engage in, advertise or hold himself out as being engaged in, nor solicit private detective business [notwithstanding] the name or title used in describing such business, unless licensed for such purpose.

And if there was any doubt, the plaintiff was surely *exempted* by the fact that his May 12, 2005 inquiry related directly to civil litigation he was conducting in Los Angeles. Because the police have so chosen to present such paucity of supporting facts, they [and the prosecution] have

likewise failed to prove that the plaintiff was *not* investigating for a civil case. Otherwise, a pro se litigant, having been allowed by a court to file and try a case, is arguably, in essence, a pro tem "attorney at law" and thereby subject to exemption for the statue further reads: "[The} provisions of this section shall not apply [to] the following: (6) An attorney at law in the practice of his profession."

But, in any case, the plaintiff does not have to rely on any sort of exemption. He simply never held himself out as being engaged in the private detective *business* [wherein one openly seeks cash, clients, and glory]. Otherwise, all that the plaintiff did, even if the police allegation [Shelly Laveroni saying that plaintiff said he was a private investigator] is taken as true, was distinguish himself from a *public* i.e. police investigator which, in all fairness, a person should be allowed to do. So what did the prosecution do with this unfounded charge? It severed the charge [with the passive and subtle unwritten and unspoken approval of the plaintiff's defense counsel, Robert Greenspan] from the disorderly conduct charge, pushed through a trial on the latter[1] and, while the plaintiff sat in jail serving his sentence on the disorderly conduct, played cat and mouse with its key witness, Shelly Laveroni, while likewise engineering a plea hearing in lieu of a trial on the former [private investigator charge], a plea that graciously offered no punishment.

And this is how it worked [with the sure and obvious anticipation that a plea would trigger a later summary judgment motion and serve to get the defendants off the hook once and for all]. At the October 31, 2008 status hearing [Whatever happened to oral argument on a Greenspan motion

---

[1] The trial court was so eager to wrap up the plaintiff's disorderly conduct trial that, when it asked the plaintiff whether he had other witnesses to call, it disregarded two important things: a) plaintiff had witnesses yet to call but which were "[not] available at this time, Your Honor", and when it asked the plaintiff "[does] the defense rest?" it never waited nor allowed for an answer in saying, "The case is done, Ladies and Gentlemen, Mr. Foreman. It's time for closing arguments." *See* Exhibit T – Page 139; Exhibit J-3

7

to dismiss? Never took place], the court is gracious and determines that a trial shall be scheduled for November 25, 2008 [private investigator charge]. The court [Judge Barrett] evens asks Prosecutor Linehan, in obvious reference to witness Shelly Laveroni, "Is that okay with your person?" And Linehan answers, "Yes." However, the trial date comes and goes while the plaintiff remains in jail, and clueless at that. And, of course, any hope of a show cause hearing comes and goes as well.[2] Ultimately, the plaintiff is hauled into court on December 2, 2008 wherein the very first words of the court [Judge Garth] are, "I will accept a guilty, filed."[3] Wait a minute, where did *that* come from? Where is the jury? Where is Shelly Laveroni? It seems, Linehan had the answer. Miss Key Witness Shelly Laveroni was in Italy [the prior week, on the date of the scheduled trial] and was not expected back until later January, early February. Needless to say, the plaintiff declined the court's invitation to plead guilty and "sweep everything under the rug" i.e. file the guilty plea away. But, alas, the court continues the plaintiff's trial until January 20, 2009 which maybe in China is "late January, early February" but certainly not Hingham, Massachusetts. One could certainly surmise further trial delay was imminent. The plaintiff did surmise for, on December 10, 2008, he agreed to a Continuance Without a Finding while, at that, making no admissions beyond the complaint. So, what was achieved? Miss Italy once again got an extended vacation while Mister Pfaff got himself a one way ticket to Summary Judgment. We might ask, was Shelly *really* in Italy all that time?

---

[2] Massacusetts RCRP Rule 3(f), by the way, states, in relevant part: "Defendants charged in a District Court with an offense within the concurrent jurisdiction of the District and Superior Courts for which the District Court will not retain jurisdiction [that is, if the District Court intends to send a case up to the Superior Court for trial] *have the right to a probable cause hearing.*"

[3] The defendants are welcome to get the transcripts of the October 31, 2008 and December 2, 2008 hearings and, well, hear for themselves. Otherwise, the plaintiff's been stuck in jail without much ability to get on the court about forwarding said audiotapes in time for transcription for this opposition. Said tapes were only received a week or so ago. *See* Affidavit Perhaps Linehan, Garth and Barrett, in the goodness of their hearts, can concede these facts without transcription at this point. Or better yet, the defendants do the transcriptions and try to show us otherwise.

8

C. **Defendant's are benefitting from their own misconduct; original charges were false and plaintiff's trial a mere iteration of such falsehood before a prejudiced jury.**

Suffice to say, watching Prosecutor Robert Linehan, last September, reciting to the jury O'Hara's May 13, 2005 police report, absolutely horrified the plaintiff, especially by he having to watch the jury [and judge] hear the patently false statement that plaintiff supposedly said, "I want to settle this fucking now." Such a statement, conceived wholly by Defendant O'Hara, was surely designed to substantiate an arrest by fulfilling a "fighting behavior" element of the disorderly conduct statute [also giving credibility to an otherwise false "lunging" allegation] and, as well, if need be [if ever a trial, and there was] to help get the plaintiff convicted. The effect on the court [and jury] of this one statement alone was tremendous. In fact, O'Hara,, through clever questioning by Prosecutor Linehan, was able to recite such infamous quote *twice* within moments of each other. Exhibit T – Pages 48,49, Lines 20, 3   By the time defense counsel motioned for a directed verdict, Judge Moynahan had made up his mind:   Exhibit T – Page 96, Line 20   There simply was nothing to settle. The plaintiff had made no claims to Shelly Laveroni, or to anyone, that he was a private investigator.

If, in fact, Shelly Laveroni never said to O'Hara that the plaintiff had said to her that he was a private investigator [by mere fact that plaintiff himself had never said such a thing] then O'Hara's credibility is about as kosher as hogwash. Even if, in the interest of defending herself and her civil co-defendants, she actually says [say, during a deposition] that the plaintiff said to her he was a private investigator, she would then still be very hard pressed to credibly explain how she came to feel she had cause to call 9-1-1. After all, her first words were: "I have a strange man here at my door and I don't know what he's doing here." Exhibit J   Really? So, he [the plaintiff] said he was a private investigator but did not say what he was investigating? Or even give his name? Nonsense.

9

The dispatcher then asks: "He's not the Magazine Guy, is he?" And Shelly answers, "No, he's not the Magazine Guy." *Ibid.* So, she supposedly "[does not] know what he [the plaintiff]'s doing here [at her door]" yet knows what he is *not*? Again, nonsense. So, why did she call 9-1-1? No where on the record is a signed or sworn statement from her of why she called 9-1-1. O'Hara's police report does not even say why. We might ask, why? Why didn't anybody say why? Are Shelly's first words sufficient to answer "why"? Then why was not the 9-1-1 tape or transcription presented at the plaintiff's trial by the prosecutor? The reason, or course, is that the tape begs for a number of explanations. But most of all, the logic of the call and the text within is in conflict with the logic and text of 'O'Hara's police report and trial testimony, even despite all of his distinct omissions. Plus, it seems, no one even acknowledged that at a neighbor – at least one neighbor – contacted Shelly which must have been only moments before the plaintiff appeared at her door as he had only left the one neighbor only moments before. *See* Complaint, Page 5 Paragraph 14

On the 9-1-1 tape, we hear Shelly say "my neighbors have told me that he [the plaintiff] has been asking a lot of questions about my family." Exhibit J Really? What neighbors? What kind of questions? *What* questions? The plaintiff only asked about a "dark blue minivan". *See* Complaint Page 5 *What* questions about "family" were asked? We do not know. We do not know for two reasons. Her statement to the 9-1-1 dispatcher is *not true.* Ans, no one [both Shelly and O'Hara] does not want anybody to know. Why? Because, again, the truth conflicts with O'Hara's report as written as well as his trial testimony as spoken. And so, again, further discovery is required to get "down to the bottom of this", to the dirty truth, especially concerning the truth about the plaintiff's contacts with the Laveroni neighbors. Did such contact as alleged by the police [Defendant Motion, Exhibit F – Rooney Report] actually, in and by itself, alarm anybody, alarm Shelly? Did she ever say so herself? No. The police have said it, but she has not said it. The neighbors have not said it

10

either [not on record, anyway]. How can a phone call to a third party by itself alarm someone else who was not called [Shelly]? So, the neighbors said that the plaintiff's phone calls to them alarmed Shelly? Why, she was not even called. Plaintiff never spoke to her again after he left her porch on May 12, 2005, not ever. But, alas, the neighbors did! But really? Perhaps it was *they* who alarmed Shelly by telling her of the phone calls [May 14, 2005] but in the context of a police involvement and by hype or fear mongering. You know, what gossip hounds are known to do? So, what *really* happened? We simply do not know for the simple reason that discovery, for one reason or another [defendant avoidance and maneuvering, the September trial, conviction and *incarceration* of the plaintiff, a pretty BIG reason], has ceased. But not for any lack of desire on the part of the plaintiff.

The point is, once the truth about the events preceding Defendant O'Hara's May 12, 2005 interception of the plaintiff are known and understood, it can then be understood why O'Hara would resort to making false allegations. The absence, from the criminal trial [and from civil discovery] of Shelly Laveroni and her neighbors, as well as Defendant Goyette's absence from said trial, left the plaintiff [as was meant to be the case] fully exposed to the prejudicial impact of O'Hara's false reporting and testimony at trial. Although plaintiff's testimony was in sharp contrast to O'Hara's, the jury deliberated less than ten minutes [accounting for transit time]. On can surely conclude that the jury gave tremendous weight to O'Hara's testimony [as well as the prosecutor's reiterations]. Yet, at this time, through discovery in a civil proceeding, opportunity exists to rectify the egregious errors committed at the plaintiff's September 18, 2008 trial. A civil case filing 16 months *prior* to a trial surely cannot be construed as a tactical move to try a criminal case in arrears, so to speak, but to try a civil case for civil claims notwithstanding any criminal trial jury verdict. Plain and simple, the plaintiff alleged a false arrest, and other tortious conduct, and must still be given opportunity to prove his claims through discovery as well as use further discovery to oppose this instant motion.

**D.  The defendants are not in compliance with Local Rule 7.1(A)(2); Shelly Laveroni's late appearance is highly suspect for it thwarts discovery; a show cause is required.**

If the current pleadings on part of the defendant, as for having "attempted to confer in good faith to resolve or narrow the issues of this matter", are legitimate [the plaintiff *was* incarcerated for quite some time, after all] he would respectfully have to say, "Well, how could *that* have been, I never saw or heard from him in over five months? " The defendants are *not* in compliance with Local Rule 7.1(A)(2) for a number of reasons. For one, Defendants Shelly and Jerry Laveroni have yet to explain to the court [and plaintiff] their 18-month default. Were they in Italy, by chance? Well, not in October for that was the month in which defense counsel [Pfaff] indicated he would turn Shelly Laveroni over for a deposition, that is, if the plaintiff agreed "to waive default". That is to say, on September 17, 2008, in a meeting in his downtown Boston office, Pfaff informed plaintiff that he had been in contact with the Laveroni's and that he was going to represent them. *See* Plaintiff Affidavit In Support of His Opposition To Defendant Town of Scituate's (And Other's) Motion For Summary Judgment, Page 3 Paragraph 16; Plaintiff Response To Defendant Town of Scituate's Certificate of Compliance With Local Rule 7.1(A)(2) [filed concurrently]

Are we to believe that the "victim" of an alleged crime(s) [Shelly] in a corresponding civil case, is being represented by the "arresting officer" i.e. key witness for the prosecution? Well, *that* explains why the Laveroni's did not, even since September 2008 when it was "revealed" they had spoken to Attorney Pfaff about a complaint and summons, officially answer said complaint and summons! The Town of Scituate retained Pfaff in 2007. When did the Laveroni's first speak with Pfaff? We do not know [no one is talking]. Should they have not answered the complaint at that time within, say, 20 days, as the court rules dictate? Certainly. However, why should they? Why not "wait and see" how plaintiff's criminal proceedings go, yes? You know, so that one knows how

12

to answer the complaint. Or, for that matter, testify at a *subsequent* trial and not conflict with the key witness for the prosecution, Defendant O'Hara, in the *first* trial? Is it any wonder the court led the plaintiff into a plea situation? *See* Argument B  The point is, the Laveroni default is highly suspect and appears to be a tactical maneuver to allow Defendant O'Hara to "say what he wants" or, for that matter, "say what he *needs* to say" i.e. perjure himself undetected.

In any case, if we give Pfaff and the Laveroni's benefit of the doubt and say they are on the level [concerning the default and the compliance issue], then how do we explain Pfaff's September request [dated September 19, 2008] for an extension of the discovery schedule but for a time *less* than six months, considerably less? After all, did not Pfaff, as of *September 18, 2008*, know of the plaintiff's six month sentence? Does *this* sound like he had any desire to continue any discovery, to "confer in good faith to resolve or narrow the issues"? And was not Pfaff aware that the plaintiff was in jail? How do we interpret Pfaff's offer of making Shelly Laveroni available for deposition? Plaintiff Affidavit 3:16  And did not Pfaff have any time or inclination to visit or write the plaintiff while in jail to "confer in good faith"? After all, Plymouth County Correctional Facility does allow attorney visits at any reasonable time *and* without appointment or advance arrangement. Otherwise, what was the plaintiff going to do? Depose Shelly Laveroni while in jail?

Face it, the Laveroni's only answered the complaint and adjoined the Town of Scituate knowing that, for all practical purposes, following a trial and later plea, the plaintiff's criminal case was over and there was no risk of Shelly having to testify under oath and thus risk conflict as previously cited. *See* Plaintiff Request For Court To Order Defendants Shelly Laveroni and Jerry Laveroni To Show Cause For Their 18-Month Delay In Answering Complaint; Plaintiff Request For Extension Of Discovery Period And Stay Of Summary Judgment Proceedings: Leave To Depose Defendant Shelly Laveroni [filed concurrently]

13

**E.      Further discovery will clarify plaintiff's 42 U.S.C. § 1983 claim; radio logs recently obtained reveal disturbing practices and procedures by the town's 9-1-1 dispatcher;**

As of the May 2005 events in question, the plaintiff had an extremely light and uneventful criminal history [one misdemeanor Failure to Yield conviction in 1999][4] However, as of July 2008 when the plaintiff, after over three years of making requests, finally came in possession of the radio logs from the May 12, 2005 incident in question, it became immediately apparent just how much influence the 9-1-1 dispatcher – a woman named "Jeannette" – had upon the day's events, namely, the plaintiff's arrest. At the time, the plaintiff had no outstanding warrants. The Scitute Police had otherwise no reason to hold the defendant except, in this case, as they said, "to investigate". *See* Complaint, Page 8, Paragraph 19

The radio logs were quite revealing. It seems, Jeannette misconstrued and misrepresented every police matter in which the plaintiff was ever involved [matters that were dropped or never even brought forward], at one point even telling O'Hara [over the radio] "He's [the plaintiff's] a kook!" Exhibit I - Page 4  At one point, Jeannette even said to O'Hara: "Yeah, he did the same thing in Hollywood, in Beverly Hills. He trespassed and occupied property without consent." This is not true [except to the extent that while the plaintiff made a lawful and well-intended inquiry to a rich and powerful literary agency, Creative Artists Agency, a woman [like Shelly] with a lot to hide – the agency's head of submissions – purposely set forth in motion a false arrest]. Surveillance

---

[4] Actually, the conviction was the result of an uncounseled plea [appealed but later denied] wherein the plaintiff had the understanding that he was pleading to a traffic violation when, in fact, it was a misdemeanor offense. The stop occurred, ironically enough, when the plaintiff was returning from federal court in Los Angles to his home at Lake Tahoe after filing a document in *Clemens v. Gavin de Becker, Inc.*  A later related case, *Clemens v. Creative Artists,* involving the movie Rain Man, was the case plaintiff was inquiring about on his May 12, 2005 visit to the Laveroni's. Strangely enough, Sherri Laveroni, Shelly's mother and Director of Operations at the Regency Hotel in New York, this past winter hosted interviews at the hotel for Tom Cruise and Dustin Hoffman, the stars of Rain Man, so said The Boston Herald [12/22 and 1/15] which, by the way, plaintiff often read while in the Plymouth County Correctional Facility serving out Judge Moynahan's sentence.

14

videotape evidence eventually and, once presented, quickly vindicated the plaintiff entirely. The plaintiff later sued and a settlement reached in December 2002. Jeanette continually gave O'Hara an impression that the plaintiff had numerous convictions when, in fact, they were mere charges, almost all dropped as meritless. One incident in particular, in early January 2002, the plaintiff was pulled over [in Massachusetts] for a defective headlight, given a ticket for both a broken light *and* a supposed "failure to pull over to the right". Where did *that* come from? Take a guess. The 1999 incident in Nevada, the "failure to yield". It seems that again a radio dispatcher relayed so-called criminal history information to an officer in the field thereby prejudicing his judgment and actions.

In the 2002 incident, the plaintiff went to the state police barracks to complain about the blatantly false "failure to pull over" ticket, had a confrontation with the trooper, and within minutes the plaintiff was forced out of his car, thrown on the ground and five trumped up charges [and five stitches] later, released [but not before determining that the whole incident was, again, caught on videotape]. Needless to say, all charges were eventually dropped. But did Jeanette know this, or even care to know this? No. All she cared about was giving an impression to Officer O'Hara that the plaintiff was Public Enemy Number One and what? All he was ever convicted for was Failure To Yield! What went wrong? The answer is, a failure on the part of the Scituate Police to properly train its dispatchers who otherwise willingly and flagrantly mislead officers in the field. A notice of warrants and convictions [violent offenses] should be all that is communicated to officers in the field, not comments like, "Yeah, he did the same thing before" or "He's a kook!". The question is, with further discovery, what else are we going to learn about how the Scituate Police operates? *See* Plaintiff Request For Leave To Amend His Complaint [filed concurrently] As for Jeannette and dispatchers like her, is this why the Scituate Police chooses to prosecute their charges themselves? And make deals like, "Pay a $100 and this will all go away"? *See* Complaint, Page 9, Paragraph 23

**F.     Further discovery will clarify to what extent that the defendants have manipulated the testimony of eye witnesses Sandra Frankman and Susan Smith.**

The truth of the matter is, the plaintiff's conduct on May 12, 2005 did not prompt a 9-1-1 call but, rather, a phone call from a Laveroni neighbor just moments before the plaintiff rang the Laveroni's doorbell to make his inquiry. By all indications, the defendants, and particularly the Scituate Police, are covering up such phone conversation by keeping any and all references to it entirely off the record. The plaintiff only learned of such phone call when, after over three years of trying to obtain the relevant 9-1-1 audiotapes, the plaintiff listened to the tapes for the first time in July of 2008 and heard [on tape] Shelly Laveroni refer to "my neighbors have told me that he [plaintiff] has been asking a lot of questions..." *See* Exhibit J  Well, that explains the *telephone* Shelly had near her when she answered the door. *See* Complaint, Page 6, Paragraph 15

And what did Defendant O'Hara have to say about any neighbor's involvement when the plaintiff, in a July 23, 2008 deposition of the officer, asked all-important questions about the so-called neighbors? O'Hara was extremely cagey and evasive. In fact, a ballet dancer could not have not done a better job dancing around the plaintiff's questions  O'Hara could not even answer a most pertinent question:  How did the neighbors know to contact him [O'Hara] at the station? His answer: "I don't know." As well, O'Hara, when asked, "Has your associate Mr. Rooney ever discussed with you any conversation he may have had with either Sandra Frankman or Susan Smith?" his answer was [unbelievably] "No." *See*  Exhibit K - O'Hara Deposition, Pages 35-37 at 36, Line 16

It is quite offensive to have O'Hara give such answers at his deposition as he did, yet have Stephen Pfaff, his attorney, in his Memorandum In Support of the Defendants' Summary Judgment Motion, then  provide a copy, without explanation, for the court's inspection, of the Rooney

Report [on the charge of harassment]. Exhibit F   It is offensive that the defendants would include a copy of the police report, itself extremely shy of details, and not have anything to say or add to the subject of the neighbors involvement when under scrutiny in a deposition. Shelly was "alarmed" [as the Rooney report alleges] by plaintiff's phone call? *See* Complaint Page 9 Paragraph 24  But the phone call[s], they were not to her, were they? No. What was it about the neighbors telling Shelly of the phone call that so-called alarmed her? We do not know this because the police have chosen to leave out numerous details. Even their exhibit - a police report – does not reveal how Shelly was told, when Shelly was told, who told Shelly, and why and how she was alarmed. The police, again, as a cover-up, are using language like "alarmed" [recall, "enraged", "lunged", "was nervous", "appeared unstable" in O'Hara's report] to create an impression of wrongdoing rather than reporting any actual facts or details of any actual wrongdoing which is otherwise hard to do when, in fact, there was no wrongdoing.

At this point, especially since the plaintiff was without benefit of the neighbor's testimony at his September 18, 2008 trial, is it vital, in both the interest of justice and fairness, that further discovery be permitted per Rule 56 so that, once and for all, and plaintiff spared further injustice, we learn what truly happened on May 12, 2005 and the days and weeks following the plaintiff's brief but fateful inquiry that now, at this point, has cost the plaintiff numerous hours of angst and frustration, thousands of dollars in travel and other costs, nearly six months of his freedom but, most of all, has cost him the respect and admiration of friends and associates both past, present and future. All said and done, the defendants are playing an awesomely wicked game that will only end after important and relevant facts, long withheld or otherwise hidden from public view, come to see the light of day as result of not only the existing discovery record to-date but one duly and rightfully enhanced through further depositions and other manners of investigation and inquiry.

17

## III. CONCLUSION

The defendants, in bringing a summary judgment motion at this time, are acting in bad faith. Given the above argument and analysis as well as supporting documents [exhibits as well as affidavit] filed concurrent with this opposition, summary judgment is neither proper nor fair at this time. As genuine issues of material fact do indeed exist, the court must deny the defendants' current motion and allow for further discovery consistent with these and other opposition-related papers filed concurrently.

## IV. STATEMENT REGARDING ORAL ARGUMENT

The plaintiff, a non-practitioner, does hereby request an oral argument hearing per Local Rule 7.1(D) so that he might have further opportunity to present legal argument and relevant case law in support of his opposition to summary judgment.

Respectfully submitted,

*Jeffrey L. Clemens*
Jeffrey L. Clemens                                Dated this 18th day of February 2009

## DECLARATION OF MAILING

I am a citizen of the United States and a resident of the State of Ohio. I am over the age of eighteen. My address is:

    412 Dockway Drive Huron OH 44839

On February 18, 2009, I served the within document:

    PLAINTIFF OPPOSITION TO DEFENDANT TOWN OF SCITUATE'S
    (AND OTHER'S) MOTION FOR SUMMARY JUDGMENT

on the defendants in said action by placing a true copy thereof enclosed in a sealed envelope with postage thereon prepaid for FIRST CLASS in the United States mail, Huron, Ohio addressed as follows:

| | |
|---|---|
| Stephen C. Pfaff | **Attorney for Defendants** |
| Louison, Costello, Condon & Pfaff | Town of Scituate, Michael O'Hara, |
| 67 Batterymarch Street | John Rooney, Shelly Laveroni and |
| Boston, Massachusetts 02110 | Jerry Laveroni |

I declare under penalty of perjury that the foregoing is true and correct.

Signature: _Donald F. Clemens_
              Donald Clemens

Date: 02-18-09